**UNITED STATES of America, Plaintiff and Counter–Defendant,**

**and**

**Environmental Defense; North Carolina Sierra Club; and North Carolina Public Interest Research Group Citizen Lobby/Education Fund, Intervenor–Plaintiffs,**

v.

**DUKE ENERGY CORPORATION, Defendant and Counter–Claimant.**

**No. CIV. 1:00CV01262.**

United States District Court, M.D. North Carolina.

Aug. 26, 2003.

Katherine E. Konschnik, Sonja Petersen, Jason Dunn, John C. Cruden, Deborah Behles, James R. Macayeal, U.S. Department of Justice, Washington, DC, for plaintiff.

James Blanding Holman, IV, Chapel Hill, NC, Jeffrey M. Gleason, Charlottesville, VA, for intervenor–plaintiff.

Albert Diaz, Nash E. Long, III, Hunton & Williams, Garry Stephen Rice, Char-

lotte, NC, Mark B. Bierbower, Henry V. Nickel, William F. Brownell, Makram Jaber, Hunton & Williams, Washington, DC, for defendant.

John J. Buckley, Jr., Robert M. Cary, Bradley J. Bondi, Williams & Connolly, Washington, DC, Jonathan Arthur Berkelhammer, Smith Moore, L.L.P., Greensboro, NC, for movant.

Peter G. Pappas, Robert Harper Heckman, Adams, Kleemeier, Hagan, Hannah & Fouts, Greensboro, NC, T. Thomas Cottingham, III, Wood W. Lay, Hunton & Williams, Charlotte, NC, Daniel W. Fouts, Adams, Kleemeier, Hagan, Hannah & Fouts, Greensboro, NC, for counter–claimant/defendant.

Gill P. Beck, Office of U.S. Attorney, Greensboro, NC, Daniel C. Beckhard, Lois J. Schiffer, Robert A. Kaplan, U.S. Department of Justice, Washington, DC, Alan Dion, U.S. Environmental Protection Agency, Office of Regional Counsel, Atlanta, GA, for counter–defendant/plaintiff.

## MEMORANDUM OPINION

BULLOCK, District Judge.

On December 22, 2000, the Attorney General of the United States acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA") filed this action against Defendant Duke Energy Corporation ("Duke Energy"). The EPA alleges that Duke Energy made modifications to and operated eight coal-fired electrical generating plants in North Carolina and South Carolina in violation of the Clean Air Act (the "CAA" or "Act"), 42 U.S.C. § 7401 *et seq.*, specifically the Prevention of Significant Deterioration ("PSD") provisions of the

Act, 42 U.S.C. §§ 7470–92, and for violations of State Implementation Plans approved under the Act for the States of North Carolina and South Carolina. On May 8, 2001, the following groups, Environmental Defense, North Carolina Sierra Club, and North Carolina Public Interest Research Group Citizen Lobby/Education Fund (hereinafter collectively referred to as "Intervenor–Plaintiffs") moved to intervene as plaintiffs. On September 6, 2001, the court granted these groups' motion to intervene, *United States v. Duke Energy Corp.*, 171 F.Supp.2d 560 (M.D.N.C.2001), and on the same date the Intervenor–Plaintiffs filed a complaint against Duke Energy alleging similar violations as those in the original complaint.

After a lengthy discovery period, which produced approximately 4.6 million pages of documents, extensive discovery disputes, and numerous pretrial motions, the parties now move for summary judgment. The EPA, Intervenor–Plaintiffs, and Duke Energy have submitted lengthy briefs, accompanied by thousands of pages of exhibits, and the motions for summary judgment are ripe for resolution. For the reasons that follow, the court will deny Duke Energy's motion for summary judgment, grant in part and deny in part the EPA's motion for partial summary judgment in which Intervenor–Plaintiffs join, deny Intervenor–Plaintiffs' motion for partial summary judgment on Duke Energy's "fair notice" defense, and deny Duke Energy's motion for partial judgment on the pleadings.

## FACTS [1]

Duke Energy is an international energy company headquartered in Charlotte,

---

**1.** The issues the court will resolve at this stage involve questions of law, *i.e.,* (1) whether the correct standard for determining routine

maintenance, repair, and replacement is "routine in the industry" or "routine at a particular generating unit"; (2) whether a

North Carolina, and has provided electricity to North Carolina and South Carolina since the early 1900s. Duke Energy's system of electrical generating facilities includes nuclear, hydroelectric, gas-fired combustion turbine, and coal-fired generating plants. Duke Energy currently operates thirty coal-fired electric generating units at eight plants located throughout North Carolina and South Carolina. It is these coal-fired units which are the subject of this litigation.

Duke Energy's coal-fired generating units were placed in service between 1940 and 1975. These units have net rated generating capacities from 38 MW (for some of the oldest units) to 1120 MW (for the newest units). Each unit of a coal-fired generating plant consists of three primary components: the boiler, the steam turbine, and the electric generator.

The boiler on these units is a large, building-like structure ranging from six to twenty stories tall and contains thousands of steel tubes in which water is heated to superheated steam with temperatures in excess of 900 F. While the specific design of each boiler at issue may differ slightly, in general the boiler consists of collections of tube assemblies, including the economizer tubes, where water is initially heated; the furnace waterwall tubes, where water evaporates to steam; the superheater tubes, where the temperature of the steam is raised just before the steam exits the boiler and reaches the turbine; and the reheater tubes, where steam from the turbine is reheated and returned to the turbine. The furnace waterwall tubes form the walls of the boiler and provide an envelope for coal combustion while also absorbing heat.

A coal-fired unit operates by converting the chemical energy contained in coal into electricity. Pulverized coal is fed into the boiler and combusted. "Flue gas" is created with temperatures of up to 3000 F when the ground coal is ignited in the boiler's furnace. The flue gas, which contains sulfur dioxide, ash particles or particulate matter, and nitrogen oxides, passes around the tubes and tube assemblies. This combustion process heats water that flows continuously through the tubes and tube assemblies making up the walls, roof, and floor of the boiler. The water in the tubes is thus converted to high pressure steam, which then flows through additional panels or assemblies of tubes to become superheated. The superheated steam enters the turbines where the pressure of the steam against a series of blades turns the turbine shaft. The turbine shaft turns the shaft of a generator, which transforms the mechanical energy into electric energy. After passing through the turbine, the steam is converted to water in condensers and pumped through feedwater heaters back to the economizer where it begins the entire steam cycle process again. Once the flue gas used to heat the water passes through the boiler, it passes through pollution control devices, if any, and exits through a stack into the atmosphere.

The EPA alleges that Duke Energy modified and subsequently operated its seven coal-fired generating plants in North Carolina and its one coal-fired generating plant in South Carolina in violation of the PSD provisions of the CAA. The EPA's allegations stem from twenty-nine projects

post project net emissions increase should be calculated assuming constant hours of operation or increased utilization; and (3) whether certain claims for statutory penalties and injunctive relief are barred by the statute of limitations. Because these legal determinations are not necessarily dependent on any particular facts, only a general overview of the facts giving rise to this action is provided.

Duke Energy engaged in between 1988 and 2000.[2] (Compl. at ¶¶ 31–292.) A detailed description of the work performed at each plant and unit would be lengthy and ultimately unnecessary.[3] However, the majority of the projects consisted of replacement and/or redesign of one or more of four sets of boiler tube assemblies—economizers, portions of waterwalls, superheaters, and reheaters. (*Id.*)

In 1984, Duke Energy placed several of the units at issue, including Buck 4, into "Extended Cold Storage" ("ECS").[4] During the period of ECS, dehumidified air was circulated through the water, steam, air, and gas passages in order to protect the units. The reason behind Duke Energy's decision to place its units in ECS is disputed. Duke Energy contends that it placed these units into ECS because it increased its system generating capacity by adding additional generating plants, which in turn led to less use of its coal-fired units.[5] Duke Energy also asserts that when it placed these units into ECS, it made definitive plans for preserving and conditioning these units while in ECS so that they could be returned to service when demand dictated. (Knudsen Decl.

---

**2.** The following plants, units, and projects are the subject of this lawsuit: (1) Allen, Unit No. 5, 2000 Project; (2) Allen, Unit No. 5, 1996 Project; (3) Allen, Unit No. 4, 1996 Project; (4) Allen, Unit No. 4, 1998 Project; (5) Allen, Unit No. 2, 1988 Project; (6) Allen, Unit No. 1, 1989 Project; (7) Belews Creek, Unit No. 2, 1999 Project; (8) Belews Creek, Unit No. 2, 1996 Project; (9) Belews Creek, Unit No. 1, 2000 Project; (10) Buck, Unit No. 5, 1991 Project; (11) Buck, Unit No. 4, 1994 Project; (12) Buck, Unit No. 3, 1994 Project; (13) Marshall, Unit No. 4, 1990 Project; (14) Marshall, Unit No. 3, 1999 Project; (15) Marshall, Unit No. 2, 1989 Project; (16) Marshall, Unit No. 2, 1996 Project; (17) Cliffside, Unit No. 2, 1993 Project; (18) Cliffside, Unit No. 3, 1990 Project; (19) Cliffside, Unit No. 4, 1990 Project; (20) Cliffside, Unit No. 5, 1992/1995 Project; (21) Cliffside, Unit No. 1, 1993 Project; (22) Dan River, Unit No. 3, 1988 Project; (23) Allen, Unit No. 3, 1994 Project; (24) W.S. Lee, Unit No. 3, 1989–90 Project; (25) Riverbend, Unit No. 4, 1990 Project; (26) Riverbend, Unit No. 6, 1991 Project; (27) Riverbend, Unit No. 7, 1992 Project; (28) Buck, Unit No. 6, 1990 Project; and (29) Marshall, Unit No. 1, 1992 Project.

**3.** The only unit that warrants a detailed description of the work performed during the alleged "modification" is Buck, Unit No. 4 ("Buck 4"), which the EPA has moved for summary judgment on. The extent and scope of the Buck 4 project, however, is disputed by Duke Energy and the EPA. The EPA describes the work performed at Buck 4 as involving the replacement of the "entire boiler backpass (including the screen tubes, generating banks,

and superheater) at Buck 4 (Boiler 7) with a completely redesigned configuration." (EPA Mem. Supp. Mot. Partial Summ. J. at 7.) In replacing the entire backpass, Duke Energy installed approximately 1,070 new tubes or approximately 7,132 feet of new tubing. In addition, the EPA contends that Duke Energy "replaced all of the waterwall tubes, floor screen tubes, and roof tubes." (*Id.* at 8.) This work involved the installation of approximately 10,700 feet of tubing. Duke Energy asserts that its boiler backpass work did not involve the replacement of the entire backpass. According to Duke Energy, the backpass work involved "replacing tubular pressure parts rather than the heavy-walled components such as the drums and headers." (Duke Energy Am. Br. Opp'n Mot. Partial Summ. J. at 3.) Furthermore, Duke Energy takes exception to the EPA's description that "all the waterwall tubes" were replaced. Duke Energy contends that the side waterwall header supply tubes were not removed and replaced. (*Id.* at 3–4.)

**4.** These project were: Allen, Unit Nos. 1 & 2; Buck, Unit Nos. 3, 4, & 5; Cliffside, Unit Nos. 1, 2, 3, & 4; Dan River, Unit No. 3; Riverbend, Unit Nos. 4, 6, & 7.

**5.** Beginning in the mid–1970s, Duke Energy brought online Belews Creek, Unit Nos. 1 & 2 (2200 MW of coal-fired capacity), and Oconee, Unit Nos. 1, 2 & 3 (2600 MW of nuclear capacity). During the 1981–1986 period, Duke Energy added four more nuclear units, McGuire, Unit Nos. 1 & 2, and Catawba, Unit Nos. 1 & 2 (4800 MW of nuclear capacity).

¶ 5 (Duke Energy Ex. 59); Kinsey Decl. ¶ 6 (Duke Energy Ex. 69).) The EPA, however, contends that Duke Energy removed these units from service due to their advanced age and condition. William S. Lee, Chairman of the Board and CEO of Duke Energy, testified before the South Carolina state public utility regulators in 1985 that the units placed into ECS were "no longer reliable because of their age and because their use as peaking units in the past few years ha[d] stressed the units, which originally were designed for base load use.... Historically, units of this age and condition would be retired and scrapped." (Lee Test. at 90 (EPA Ex. 13).) Lee further explained that Duke Energy had plans to rehabilitate the units, but if it continued to operate the units in their current condition they would "simply fall apart, or damage themselves in a very serious way." (Lee Test. at 41 (EPA Ex. 15).)

Shortly after placing its units into ECS, Duke Energy developed a "Plant Modernization Program" ("PMP"). Based on information gathered during inspection of the units, Duke Energy developed plans to address a variety of maintenance, repair, and replacement needs. According to Duke Energy, the purpose for PMP was "[t]o conduct maintenance and upgrade to selected fossil generating units so that they operate safely, reliably and cost effectively for an additional 20 years." (Plant Modernization Project Review (Apr. 24, 1989) at 2 (EPA Ex. 23).) According to Duke Energy's "PMP Strategy Statement," the "extended operating life of the rehabilitated units is a cost-effective alternative to the addition of new capacity."

(Mem. from Parker to Owen, et al. (Feb. 13, 1986) (EPA Ex. 25).)

Any work performed at the units not placed into ECS was undertaken during regularly scheduled planned turbine outages.[6] Regularly scheduled outages typically occur at a unit every forty-eight to eighty-four months depending on the particular unit's condition and other system requirements.

On December 22, 2000, approximately twelve years after the completion of Duke Energy's earliest PMP project, the United States on behalf of the EPA filed the present suit against Duke Energy. The EPA contends that Duke Energy's projects at its coal-fired units were "modifications" and thus triggered the requirements of PSD. A unit that is subject to PSD must obtain a preconstruction review and permit. If it is determined during this review that a proposed project will modify an existing unit and thereby increase the level of emissions, the operator of the unit is required to install the best available control technology for pollutants emitted by the particular unit.

As noted previously, Duke Energy, the EPA, and Intervenor–Plaintiffs have all moved for summary judgment or partial summary judgment. Duke Energy seeks summary judgment dismissing all claims of the EPA and Intervenor–Plaintiffs. It argues that the EPA cannot establish that the projects undertaken at its coal-fired generating units were non-routine maintenance, repair, and replacement activities or that the projects caused a net emissions increase.

6. These projects were: Allen, Unit No. 3, 1994 Project; Allen, Unit No. 4, 1996 & 1998 Projects; Allen, Unit No. 5, 1996 & 2000 Projects; Belews Creek, Unit No. 1, 2000 Project; Belews Creek, Unit No. 2, 1996 & 1999 Projects; Buck, Unit No. 6, 1990/1991 Project; Cliffside, Unit No. 5, 1992/1995 Project; W.S. Lee, Unit No. 3, 1989/1990 Project; Marshall, Unit No. 1, 1992 Project; Marshall, Unit No. 2, 1989 & 1996 Projects; Marshall, Unit No. 3, 1999 Project; Marshall, Unit No. 4, 1990 Project.

As to the issue of whether Duke Energy's projects were routine maintenance, repair, and replacement, Duke Energy contends that the established interpretation of what is routine " '*must* be based on the evaluation of whether that type of equipment has been repaired or replaced by *sources within the relevant industrial category.*' " (Duke Energy Br. Supp. Mot. Summ. J. at 35 (quoting 57 Fed.Reg. 32,-314, 32,326 (July 21, 1992)).) Under this standard, according to Duke Energy, its component repair and replacement projects were not modifications because they consisted of repairs and replacements that are common in the utility industry.

Duke Energy similarly argues that its component repair and replacement projects were not modifications because they did not increase the units' levels of emissions. Duke Energy contends that under the 1980 PSD regulations, a net emissions increase will result only if there is an increase in the hourly rate of emissions. It acknowledges that for purposes of PSD, emissions are measured in annual tons per year. Yet Duke Energy argues that in calculating post-project actual emissions, the regulations require that the hours and conditions of operation be held constant. Accordingly, because none of the projects increased a unit's hourly capacity to emit pollution, there is no increase in emissions from pre-project levels.

The EPA and Intervenor–Plaintiffs move for partial summary judgment on similar grounds. They, too, seek a legal determination as to the appropriate standard for determining what is routine maintenance, repair, and replacement. The EPA and Intervenor–Plaintiffs argue that the standard is not the industry or source category standard advanced by Duke Energy. Rather, they contend that whether a particular project is routine maintenance, repair, and replacement must be determined based on whether that type of project is routine within the life of a generating unit. The EPA and Intervenor–Plaintiffs also request partial summary judgment that the "comprehensive renovation" at Buck 4 was a physical change that does not qualify as routine maintenance and repair. Furthermore, the EPA and Intervenor–Plaintiffs move for partial summary judgment as to Duke Energy's defense that it did not have fair notice of the EPA's interpretation of the PSD regulations.

The EPA and Intervenor–Plaintiffs, similar to Duke Energy, also seek a legal determination as to how post-project emissions should be calculated. The EPA argues that PSD requires that the source predict annual emissions increases prior to construction. In predicting an increase in emissions, the EPA asserts, the source operator must consider the hourly rate of emissions and the increased utilization of the unit following the project. As to Buck 4 specifically, the EPA argues that because the project enabled Duke Energy to utilize a previously inoperable unit, the project resulted in a net increase in emissions.

Finally, the EPA and Intervenor–Plaintiffs seek partial summary judgment that the claims for penalties and injunctive relief with respect to modifications that were completed more than five years before this suit was filed are not barred by the statute of limitations. Duke Energy previously moved for partial judgment on the pleadings arguing that such claims were barred by the statute of limitations. The court deferred ruling on Duke Energy's motion in order to allow the record to develop more fully. Duke Energy's motion for partial judgment on the pleadings, as well as the EPA and Intervenor–Plaintiffs' motion for partial summary judgment, is ripe for resolution.

## DISCUSSION

### I. Standard of Review

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in [its] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. See Fed.R.Civ.P. 56(e); *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (moving party on summary judgment motion can simply argue the absence of evidence by which the non-movant can prove its case). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

In general, reviewing courts typically grant substantial deference to the EPA's interpretation of the CAA Amendments and its implementing regulations. The reasoning behind this deferential review is that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Deference to agency interpretation is particularly appropriate where the subject being regulated is technical and complex. *Aluminum Co. of Am. v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984). An agency's interpretation of its own regulations must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). However, "this standard does not give the EPA unbridled discretion to construe the [CAA] Amendments free from judicial oversight. [The court] must consider whether the EPA's construction comports with its statutory mandate and Congress's intent in enacting clean air legislation." *Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 907 (7th Cir.1990) ("*WEPCO*").

### II. Statutory and Regulatory Background

One of the primary purposes of the CAA is to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again." H.R.Rep. No. 91–1146, at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356, 5356. In order to accomplish the congressional objective of "protect[ing] and enhanc[ing] the quality of the Nation's air resources," 42 U.S.C. § 7401(b)(1) (1995), Congress directed the EPA to develop National Ambient Air Quality Standards ("NAAQS") which specify the maximum allowable concentrations of air pollutants for different areas of the country. *Id.* § 7409. Based on the levels of pollution established by the EPA, the

states were required to develop State Implementation Plans ("SIPs") that defined source-by-source emissions limits so that each state could meet the NAAQS. *Id.* § 7410; *Train v. Natural Res. Def. Council, Inc.,* 421 U.S. 60, 66–67, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Areas that meet the NAAQS for a particular pollutant are designated as "attainment" areas and areas that do not meet the NAAQS are designated "non-attainment" areas. 42 U.S.C. § 7407(d) (1995).

As part of the 1970 CAA Amendments, Congress required the EPA to promulgate New Source Performance Standards ("NSPS") in order to regulate and minimize the environmental impact from the emission of air pollutants from "new sources." The NSPS regulates hourly emission rates (expressed as kg/hr) and applies to both newly constructed sources and to "modifications" of existing facilities that create new or increased pollution. Under NSPS, Congress defined "new source" as "any stationary source, the construction or *modification* of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source." *Id.* § 7411(a)(2) (emphasis added). Congress then defined "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." *Id.* § 7411(a)(4).

Due to the cost and difficulty of installing new pollution control technologies on existing sources, the EPA provided exemp-

tions from the "modification" rule for certain activities undertaken at already operating sources. The regulations initially provided that "[r]outine maintenance, repair, and replacement shall not be considered physical changes." 40 C.F.R. § 60.2(h)(1) (1971) (Duke Energy Ex. 4). This standard was later clarified to mean that a modification shall not include "[m]aintenance, repair, and replacement which the Administrator determines to be routine for a source category." 40 C.F.R. § 60.14(e)(1) (1975) (Duke Energy Ex. 6). The regulations also provided that increases in hours of operation or production rates within the operating design capacity of a facility are not considered modifications. 40 C.F.R. § 60.2(h)(2)(ii) (1971) (Duke Energy Ex. 4); 40 C.F.R. § 60.14(e)(2), (3) (1975) (Duke Energy Ex. 6).

In 1977 Congress again amended the CAA by enacting a program called New Source Review ("NSR"). The NSR had provisions for the protection of areas with relatively clean air, Prevention of Significant Deterioration ("PSD"), and for areas that did not meet certain air quality standards, Non–Attainment New Source Review ("NNSR").[7] PSD was designed to ensure that the air quality of relatively unpolluted areas, *i.e.,* attainment areas, did not decline to the minimum levels permitted by NAAQS due to increases in total annual emissions. To prevent significant deterioration of air quality, operators of regulated sources in attainment areas are required to limit emissions to a "baseline rate" and obtain a permit before constructing or *modifying* facilities. 42 U.S.C. § 7475(a)(1) (1995).

---

**7.** PSD applies to emissions increases in attainment areas, while NNSR applies to emissions increases in non-attainment areas. The EPA has alleged violations of PSD because

the areas of North Carolina and South Carolina where Duke Energy operates the units at issue are in attainment areas for all relevant pollutants.

When Congress enacted the PSD program, it incorporated by explicit reference the NSPS definition of modification into the NSR definition of construction/modification. *Id.* § 7479(2)(C)(PSD) ("The term 'construction' ... includes the modification (as defined in section 7411(a) of this title [NSPS]) of any source or facility."); *id.* § 7501(4) (NNSR) ("The terms 'modifications' and 'modified' mean the same as the term 'modification' as used in section 7411(a)(4) of this title [NSPS]."). The PSD statutory definition incorporated not only the NSPS statutory definition of modification, but also the regulations implementing the NSPS program. A House–Senate Conference Committee report explained the congressional intent "to conform" the NSR definition of modification to the "usage in other parts of the Act." 123 Cong. Rec. H11956, 3665 (daily ed. Nov. 1, 1977) (Duke Energy Ex. 13). The EPA explained that "[t]he phrase 'usage in other parts of the Act' most probably refers, not only to section 111(a)(4) [NSPS], but also to the EPA regulations implementing section 111 that were in effect at the time." 49 Fed.Reg. 43,211, 43,213 (Oct. 26, 1984) (Duke Energy Ex. 14). In addition, the Director of the Stationary Source Compliance Division, Edward E. Reich, explained:

[T]he Clean Air Act provides in Section 169(1)(c) that for PSD purposes the term modification shall be defined as that term is defined in Section 111(a) of the Act relating to NSPS. EPA has interpreted this to mean that for PSD purposes Congress intended the term modification to include all exemptions included in the NSPS regulations promulgated under Section 111 of the Act prior to the date of enactment of Section 169.

(Mem. from Reich to Davis (Apr. 21, 1983) at 2 (Duke Energy Ex. 16).)

Subsequent to the congressional enactment of NSR, the EPA promulgated regulations for PSD. The regulation at the center of the controversy between the parties is the regulation concerning the term "modification." Under its 1980 PSD regulations, which the parties acknowledge as the controlling regulations, the EPA defined modification as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 51.166(b)(2)(i) (1987) (Duke Energy Ex. 21). Accordingly, to trigger the PSD's permitting requirement and the requirement to install pollution controls, two criteria must be satisfied: (1) there must be a "physical change" and (2) there must be a "significant net emissions increase."

The term "physical change" has been interpreted broadly. "[T]he most trivial activities—the replacement of leaky pipes, for example—may trigger the modification provisions if the change results in an increase in the emissions of a facility." *WEPCO*, 893 F.2d at 905. The EPA promulgated under the PSD program regulatory exclusions from the definition of modification using substantially the same terms it used in the NSPS regulations. Specifically, the EPA created an exemption for "[r]outine maintenance, repair, and replacement" ("RMRR"). 40 C.F.R. § 51.166(b)(2)(iii)(a) (1987) (Duke Energy Ex. 21). The meaning and scope to be afforded this exemption is one of the central disagreements between Duke Energy and the EPA. The issue for the court to decide is whether RMRR should be defined relative to an industrial category or to a particular unit. The EPA's PSD regulations also provided that a physical change or change in the method of operation shall not include "[a]n increase in the

hours of operation or in the production rate." *Id.* § 51.166(b)(2)(iii)(f).

The second criteria necessary to trigger the PSD's requirements is that the physical or operational change must cause a "significant net emissions increase." Under the PSD regulations, a "net emissions increase" is defined as "[a]ny increase in actual emissions from a particular physical change or change in the method of operation at a stationary source." *Id.* § 51.166(b)(3)(i)(a). Unlike NSPS which measures emissions increases based on an hourly rate, PSD measures emissions based on total annual emissions. The second primary issue of disagreement between the parties is the appropriate emissions test that should be employed in calculating the post-project emissions rates.

### III. *Routine Maintenance, Repair, and Replacement*

■ The court is presented with two different interpretations of the RMRR exemption. As described by the Eleventh Circuit, the "central disagreement between [the utility] and EPA is whether 'routine' should be defined relative to an industrial category or to a particular unit." *Tennessee Valley Auth. v. United States EPA*, 278 F.3d 1184, 1189 n. 3 (11th Cir.2002).

The EPA argues that the RMRR exemption requires "a case-by-case determination of whether the activity is routinely performed at an individual unit within the relevant industrial category, considering common-sense factors such as nature and extent, purpose, frequency, and cost," (EPA Mem. Supp. Mot. Partial Summ. J. at 1), and that this has been the EPA's "long-standing interpretation." [8] (*Id.* at 23.) Conversely, Duke Energy asserts that the " 'routine' inquiry has as its ultimate purpose the determination of whether a project is routine in the industry, considering all relevant facts—*e.g.*, nature and extent, scope, frequency, and cost." (Duke Energy Am. Br. Opp'n Mot. Partial Summ. J. at 29.)

#### A. *Legislative intent*

The EPA has promulgated under its regulations an RMRR exemption since the enactment of the NSPS. 40 C.F.R. § 60.2(h)(1) (1971) (Duke Energy Ex. 4) ("Routine maintenance, repair, and replacement shall not be considered physical changes."). This exemption was designed to achieve the congressional intent of not subjecting existing sources to the costly requirements of installing advanced pollution control devices.[9] Such a provision

---

**8.** The EPA cites two recent decisions, *In re Tenn. Valley Auth.*, CAA Docket No. 00–6, 2000 WL 1358648 (Envt'l Appeals Bd., U.S. EPA Sept. 15, 2000) (EPA Ex. 100), and Detroit Edison Applicability Determination (May 23, 2000) (EPA Ex. 101), to strengthen its position that the "routine at an individual unit" standard has consistently been applied. (EPA Mem. Supp. Mot. Partial Summ. J. at 22–23.) Both decisions, however, were issued following the EPA's decision in 1999 to initiate a number of enforcement proceedings. Further, with respect to the order issued in *In re Tenn. Valley Auth.*, the objectivity of this decision has been brought into question because of the failure of the proceedings to comply with the requirements of due process. *Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236

(11th Cir.2003). The Eleventh Circuit, therefore, held that the EPA must prove the existence of a CAA violation in district court, and until that time the EPA's decision was "legally inconsequential." Accordingly, given the potentially self-serving nature of these decisions, they do not evidence a long-standing interpretation.

**9.** *See* S.Rep. No. 91–1196, Comm. on Public Works, 91st Cong.2d Sess. (1970), *reprinted in* Legal Compilation: Statutes and Legislative History, Environmental Protection Agency (Jan.1975), at 15–16 (Duke Energy Ex. 3) ("The overriding purpose of [NSPS is] to prevent new air pollution problems, and towards that end, maximum feasible control of new sources at the time of their construction is

was necessary because of the expansive meaning afforded "physical change" under the definition of modification. In 1975, the EPA clarified that the RMRR provision under NSPS excluded from the definition of modification "[m]aintenance, repair, and replacement ... routine for a source category." 40 C.F.R. § 60.14(e)(1) (1975) (Duke Energy Ex. 6); 40 Fed.Reg. 58,416, 58,419 (Dec. 16, 1975) (Duke Energy Ex. 7).

Under this regulatory framework, Congress enacted the PSD program in 1977. A generating facility is subject to the strictures of the PSD program if it undergoes "construction," which Congress defined by explicitly incorporating the definition of "modification" under NSPS. 42 U.S.C. § 7479(2)(C) (1995). In accordance with this statutory mandate, the EPA defined the term "modification" as "any physical [or operational] change ... that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 51.166(b)(2)(i) (1987) (Duke Energy Ex. 21). Also consistent with the NSPS definition of modification, the EPA promulgated a provision excluding from the definition of "modification" projects undertaken at a facility that are "[r]outine maintenance, repair, and re-

placement." *Id.* § 51.166(b)(2)(iii)(a). In order to give the PSD RMRR exemption its proper scope, this provision must be defined according to what is routine maintenance, repair, and replacement within the relevant source category.[10] This construction is compelled by the statutory mandate of the PSD program and congressional intent.

When Congress enacted the NSR program, it specifically stated its intent to incorporate the NSPS "usage" of the term "modification" into PSD, including the 1975 NSPS exclusion for maintenance, repair, and replacement projects that are routine for a source category. 42 U.S.C. § 7479(2)(C) (1995) ("The term 'construction' ... includes the modification (as defined in [NSPS]) of any source or facility."); 123 Cong. Rec. H11956, 3665 (daily ed. Nov. 1, 1977) (Duke Energy Ex. 13) (explaining Congress's intent "to conform" NSR definition of modification to the "usage" in NSPS). The EPA confirmed this congressional design. (Duke Energy Ex. 16 at 2) ("EPA has interpreted ... that for PSD purposes Congress intended the term modification to include all exemptions included in the NSPS regulations promulgated ... prior to the date of [PSD's] enactment ....").[11] Therefore, to be consistent

---

seen by the committee as the most effective and, in the long run, the least expensive approach.").

10. The court in *United States v. Southern Ind. Gas & Elec. Co.*, 245 F.Supp.2d 994, 1007–10 (S.D.Ind.2003) (*"SIGECO "*), granted summary judgment for the EPA as to SIGECO's fair notice defense. As to the correctness of this determination, this court expresses no opinion. The *SIGECO* court also concluded that the EPA's position that RMRR should be defined relative to an individual unit was reasonable and therefore entitled to deference. The court in *United States v. Ohio Edison Co.*, 276 F.Supp.2d 829, 844–45, 2003 WL 21910738, at *24–26 (S.D. Ohio 2003), arrived at a similar conclusion. As to that

determination, this court, for the reasons contained herein, respectfully disagrees.

11. Walter C. Barber, the former Director of EPA's Office of Air Quality Planning and Standards ("OAQPS"), explained:

OAQPS carried over into the PSD and NNSR regulations the general mindset regarding the magnitude and scale needed to trigger a modification developed under the NSPS program and the specific NSPS definitional terms of "modification," "routine maintenance repair and replacement," and "increased hours of operation" and our interpretations thereof. Furthermore, as used in the PSD and NNSR programs, OAQPS gave these terms the same meaning and intent as in the NSPS program and

with the NSPS "usage" of RMRR, the RMRR provision under PSD must be applied to cover those projects that are routine for a source category. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (" 'If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.' " (quoting *Chevron U.S.A.*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778)). The EPA acknowledged this standard for the PSD's RMRR exemption in 1992 by:

> clarifying that the determination of whether the repair or replacement of a particular item of equipment is "routine" under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.

57 Fed.Reg. 32,314, 32,326 (July 21, 1992).[12] The EPA specifically referred to "electric utilities" as a "source category." *Id.* at 32,317.

B. *WEPCO applicability determination*

Prior to this affirmation of the routine in the industrial category standard for RMRR, the EPA issued an NSPS and PSD applicability determination for a proposed project at Wisconsin Electric Power Company's ("WEPCO") Port Washington facility. The EPA explained that "[i]n determining whether proposed work at an existing facility is 'routine,' EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding." (Mem. from Clay to Kee (Sept. 9, 1988) at 3 (EPA Ex. 73).) The EPA intended this determination, which was set forth in a memorandum prepared by Don R. Clay, Acting Assistant Administrator for Air and Radiation, to be used not only by WEPCO, but also by other utilities which might seek to claim the RMRR exemption. (*Id.* at 2.)

WEPCO proposed a project at its five-unit Port Washington Power Plant that contemplated replacing rear steam drums, each of which measured 60 feet in length, 50.5 inches in diameter, and 5.25 inches in thickness; plate-type air heaters; and other components. (*Id.* at 4.) The five units at the Port Washington plant were originally rated at "80 megawatts electrical output capacity," but due to the deterioration of the physical plant, the units had operated at a maximum achievable capacity less than their original design capacity. (*Id.* at 2; Mem. from Kee to Emison (Mar. 25, 1988) (Duke Energy Ex. 31) (indicating

---

believed that the same order of magnitude and scale needed to trigger NSPS would apply to the PSD and NNSR programs. Barber Expert Report at 8 (Duke Energy Ex. 10).

**12.** This "clarification" was not a pronouncement of a new rule. Indeed, the EPA stated that commentators had requested that the EPA "define or provide guidance on 'routine repair, replacement and maintenance' activities," but the rules the EPA was promulgating "did not deal with this aspect of the regulations." 57 Fed.Reg. at 32,326. The EPA recognized, however, that the RMRR exemption could potentially affect the rules it was

issuing, and therefore stated its "plans to issue guidance on this subject as part of a NSR regulatory update package which EPA presently intends to propose by early summer." *Id.* The EPA went on to state that "[i]n the meantime" it would clarify the appropriate standard for determining RMRR. *Id.* The EPA, nonetheless, now argues that what is routine within the "relevant industrial category" is inapplicable to PSD. It would be a nonsensical interpretation of the EPA's 1992 clarification of the PSD RMRR exemption standard to assume that the EPA was clarifying a standard that did not exist under the exemption in the first instance.

that units had been derated from their design capacity of 80 MW each to operating capacities ranging from 49 MW to 75 MW).) The EPA indicated that following the proposed project "[p]lantwide capacity would increase about 40 percent above current levels to 400 megawatts." (Duke Energy Ex. 31 at 2.) Given this information, the EPA determined that the "work proposed at Port Washington [was] far from being a regular, customary, or standard undertaking." (EPA Ex. 73 at 3.) "Rather, [it was] a highly unusual, if not unprecedented, and costly project." (*Id.* at 4.)

In subsequent correspondence with WEPCO, the EPA further indicated that based on an informal survey, it had detected "no examples of steam drum replacement at aged electric generating facilities." (Letter from Thomas to Boston (Oct. 14, 1988) at 4 (Duke Energy Ex. 29).) Similarly, in response to WEPCO's contention that forty other units had replaced similar air heater elements, the EPA concluded that "no units containing plate elements such as those on units 1–4 at Port Washington" had ever replaced air heaters. (Letter from Clay to Boston (Feb. 15, 1989) at 7 (Duke Energy Ex. 30).) Accordingly, the EPA concluded that WEPCO's proposed project was not RMRR and the projects were therefore subject to NSPS and PSD.

WEPCO appealed the EPA's determination to the Seventh Circuit Court of Appeals. The court affirmed the EPA's determination that the project proposed at the Port Washington plant was not RMRR. *WEPCO*, 893 F.2d at 910–13. The court agreed with the EPA that "far from being routine, the Port Washington project apparently was unprecedented: 'WEPCO did not identify, and EPA did not find, even a single instance of renovation work at any electric utility generating station that approached the Port Washington life

extension project in nature, scope or extent.'" *Id.* at 911 (quoting EPA Br. at 44). Although the record was silent, the court "surmised" that the unprecedented character of the Port Washington project "may reflect historical practice in the electric utility industry" to replace facilities once they have reached their useful life. *Id.*

Among its arguments before the Seventh Circuit, WEPCO argued, as it had before the EPA, that its proposed replacement of air heaters paralleled similar replacements of air heaters at forty other plants. *Id.* In affirming the EPA's determination that the forty other air heater replacements were dissimilar, the court noted that "the plate-type air heaters at issue in the Port Washington project must be replaced *in whole*" while the air heaters at the forty other units, which contained tubular type heaters, "permitt[ed] the replacement of the heat transfer surface without requiring the removal of the entire unit." *Id.*

The EPA and the Seventh Circuit both confirmed the relevance of industry practice under the RMRR analysis. The EPA gave considerable attention to WEPCO's contention that the types of replacements it contemplated undertaking were "routine" because others in the industry had undertaken similar projects. While in the end the EPA disagreed, its disagreement was with WEPCO's characterization of the projects undertaken elsewhere, not with WEPCO's position that what other utilities were doing should inform the EPA's analysis. For example, in the Clay Memorandum, the EPA stated that the "work called for under the project was rarely, if ever, performed." (EPA Ex. 73 at 5.) This conclusion was confirmed by WEPCO which stated: "Generally, the renovation work items included in this application are those that would normally occur only once or twice during a unit's expected life cycle."

(*Id.*) If the relevant inquiry under the RMRR exemption is whether a particular activity is "routinely performed at an individual unit" as the EPA now asserts, the EPA in WEPCO could have simply concluded its RMRR inquiry with the admission by WEPCO that the proposed project would occur only once or twice during a unit's expected life cycle.

The EPA, however, requested that WEPCO "submit information regarding the frequency of replacement of steam drums, the largest category of work item called for under the project." (*Id.*) In response to this request, "WEPCO reported that to date, no steam drums have ever been replaced at any of its coal-fired electrical generating facilities." (*Id.*) WEPCO was able to provide examples of other "headers" comparable in design pressure and function, but the EPA distinguished these headers on the ground that they were not comparable in size. (*Id.* at 5–6 (stating that "the largest of these [headers] was 16 inches in diameter, and EPA does not believe that they are comparable in diameter, wall thickness, function, or importance to the rear steam drums at Port Washington").) The characteristic used to differentiate these "header" replacements from the rear steam drum header replacements proposed by WEPCO was not the extent to which the other headers had or had not been replaced, but rather was the size of the header and presumably the extent and cost of the work required to replace them.

In addition, WEPCO argued to the EPA that its rear steam drum replacements were routine, principally relying on its identification of four other steam drum replacement projects at other facilities. The EPA rejected WEPCO's reliance on these steam drum projects, finding that they were not "sufficiently similar to the Port Washington project." (Duke Energy Ex. 29 at 3.) The EPA distinguished several of the projects from WEPCO's project primarily on the ground that they did not involve utility boilers, *i.e.*, they were not in the same source category. (*Id.* at 4.) Moreover, the EPA indicated that the results of its informal survey revealed "no examples of steam drum replacement at aged electric generating facilities." (*Id.*) The fact that no other utilities replaced steam drums can be relevant only if the appropriate inquiry is what is routine within the industry. Otherwise, there would be no need for the EPA to conduct an informal survey given that steam drums are replaced only once or twice in the life of a generating unit.

The EPA attempts to bolster its current position that the EPA did not apply a routine in the industry standard in WEPCO by citing the EPA's conclusion as to the forty units that WEPCO alleged engaged in similar air heater replacement projects. The EPA concluded that the projects performed at the forty units identified by WEPCO involved a different type of air heater and were therefore "too dissimilar to the plate-type elements in use at units 1–4 to support WEPCO's contention that the work in question is routine." (Duke Energy Ex. 30 at 7.) This conclusion was affirmed by the Seventh Circuit. *WEPCO*, 893 F.2d at 911. The EPA continued, however, and stated:

> Further, even the list of air heater replacement work submitted by WEPCO did not establish this as routine repair work. Those 40 units comprise only a small fraction of total operating utility units, and even at the 40 units, air heater repair or replacement appears to have been a one-time occurrence, not routine repair.

(Duke Energy Ex. 30 at 7 n. 6.) Contrary to the EPA's position, this reference further supports the industry standard for

RMRR. Even if the replacement projects at these forty units were similar to the WEPCO project, the EPA determined that a particular project performed at forty units, which "comprise only a small fraction of total operating utility units," is not representative enough of the industry to establish that the project was routine. Furthermore, the EPA concluded in the alternative that this type of project could not be considered routine for the industry because these forty units did not undertake this type of project with enough frequency. If the air heater replacements were frequently performed at an individual unit and therefore "routine repair," by implication air heater replacements would be "routine repair" for the industry.

■ The EPA's continual reference to other projects within the utility industry confirms Congress's intent to define RMRR under PSD according to the relevant source category. The EPA, however, continues to argue that the reference in the WEPCO applicability determination to the fact that the proposed replacements would be performed only once or twice during the life of a unit reveals the appropriate standard for RMRR to be routine at an individual unit and that its interpretation is entitled to deference. To accept this proposition would require that one completely ignore all references in the WEPCO determination to what was done in the industry. Moreover, " 'an agency's interpretation of a statute or regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view.' " *Miller v. AT & T Corp.,* 250 F.3d 820, 832 (4th Cir.2001) (quoting *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 515, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)).

The EPA further asserts that its position is supported by the Seventh Circuit's decision, arguing that the court was "par-

ticularly persuaded" by the fact that the proposed activity occurred so infrequently at the particular units. (EPA's Mem. Supp. Mot. Partial Summ. J. at 22.) Duke Energy rightly points out, however, that the "opinion itself ... ascribes no overriding importance to that fact." (Duke Energy's Am. Br. Opp'n Mot. Partial Summ. J. at 17.) Indeed, the next sentence of the opinion provides: "WEPCO reported that it had never previously replaced a steam drum or 'header' of comparable size at any of its coal-fired electrical generating facilities." *WEPCO,* 893 F.2d at 912. The court's recognition of both the frequency of a project at an individual unit and in the industry confirms the relevant scope of the RMRR inquiry to be what is routine within the industry.

The only way in which both experience at a unit and in the industry at large can be relevant is under a routine within the industry standard. Projects that are repeatedly performed at a particular unit will be routine in the industry, as will projects performed at a number of units within the industry. If the relevant inquiry were that proposed by the EPA, namely that RMRR applies only to "activity routinely performed at an individual unit," consideration of what occurred within the utility industry is irrelevant. The EPA in WEPCO could have simply dismissed WEPCO's attempt to support the routineness of its proposed project by reference to other projects, as it does with Duke Energy here, and relied primarily on WEPCO's admission that the proposed project would be performed only once or twice in the life of a unit. Accordingly, applying its multi-factored test, the EPA could have determined that the project did not qualify as RMRR. Yet even if the EPA were to consider what occurred within the industry, the relevant inquiry under a "routine for an individual unit" standard would be the number of times a particular

project is undertaken at a unit. The focus of the EPA's effort at distinguishing the projects identified by WEPCO from the Port Washington project, however, was on the type of equipment replaced, not the frequency with which it was replaced.

The EPA's "routine for an individual unit" interpretation of the WEPCO determination is certainly consistent with its analysis of the Buck 4 project. Nowhere in its discussion of the relevant factors as applied to this unit does the EPA consider what other utilities have done or are doing. This aspect of the WEPCO analysis has completely disappeared. What has occurred within the industry, however, is relevant and must inform the routine inquiry. This is revealed by the EPA's careful consideration of the other projects identified by WEPCO. This is also revealed by Congress's intent to define the application of the PSD program according to the definitions and exemptions provided under the NSPS program. The EPA confirmed this intent in 1992 and must now apply the law as intended by Congress and as previously applied.

## C. EPA's post-WEPCO statements

The "routine in the industry" standard is also supported by the EPA's statements that the WEPCO determination would not affect utility life extension projects.[13] In December 1988, the Chairman of the House Subcommittee on Oversight and Investigations, Congressman John Dingell, informed the EPA Administrator, Lee Thomas, that his subcommittee had requested the Government Accounting Office ("GAO") to prepare a report on utility life extension issues. (Letter from Dingell to Thomas (Dec. 21, 1988) (Duke Energy Ex. 88).) The GAO issued its report in September 1990, stating that "[a]ccording to EPA policy officials, WEPCO's life extension project is not typical of the majority of utilities' life extension projects and concerns that the agency will broadly apply the ruling it applied to WEPCO's project are unfounded." (GAO 1990 Report at 30–31 (Duke Energy Ex. 42).) "Lending evidence to the officials' statements," the re-

---

13. The EPA was aware of the utility industry practice of engaging in life extension projects as early as the 1980s. For example, EPA inspection reports from the 1980s indicate that projects were being performed that involved "major work aimed at upgrading and extending the operating life of [the] boilers" at an "estimated ... cost of $50 million." (Inspection Report of Riverside Generating Station (Oct. 18, 1985) (Duke Energy Ex. 78).) Another report stated that a unit was out for a "13 week life extension major overhaul, estimated to cost approximately $15 million." (Inspection Report of Beckjord Generating Station (Mar. 14, 1988) (Duke Energy Ex. 78).) Furthermore, a 1989 EPA-directed study designed to assess future utility air emission trends assumed that existing coal-fired power plants would continue to operate at original capacity for fifty-five to sixty-five years, being "refurbished" around age thirty. (1989 EPA Base Case Forecasts, App. C (Duke Energy Ex. 40); Letter from Schweers to Beck (July 26, 1989) (Duke Energy Ex. 41).)

In March 1986, three EPA policy analysts published an article in which they listed ten "life extension" projects of which they were aware, including Duke Energy's PMP projects at the Dan River and Allen Plants. (James DeMocker, Judith Greenwald, Paul Schwengels, *Extended Lifetimes for Coal–Fired Power Plants: Effect Upon Air Quality*, Pub. Util. Fortnightly 30, Mar. 20, 1986, at 32–33 (Duke Energy Ex. 79).) That same year, an EPA official attended an Electric Power Research Institute ("EPRI") conference on "Life Extension and Assessment of Fossil Plants." (U.S. Resp. to Def.'s Req. for Admis. No. 223 (Excerpt at Duke Energy Ex. 81).) EPRI published the proceedings of the conference in an 1,100–page publication in which utilities, including Duke Energy, presented detailed descriptions of many "life extension" projects. (*Conference Proceedings: Life Extension and Assessment of Fossil Power Plants*, EPRI Pub. CS–5208 (1987) (Excerpt at Duke Energy Ex. 82).)

port noted, "EPA's 1989 emission forecast assumed that the WEPCO decision would not result in a significant number of additional power plants having to comply with the NSPS and the PSD program requirements." [14] (*Id.* at 31.)

Chairman Dingell formally transmitted the report to the EPA and asked the Administrator about WEPCO and the GAO report's assessment. (Letter from Dingell to Watkins *et al.* (Oct. 9, 1990) (Duke Energy Ex. 94).) Assistant Administrator William Rosenberg responded for the EPA, stating that "[a]s indicated in the GAO report, it is expected that most utility projects will *not* be similar to the WEPCO situation" and that the "[WEPCO] ruling is not expected to significantly affect power plant life extension projects." (Letter from Rosenberg to Dingell (June 19, 1991) at 5–6 (Duke Energy Ex. 44).)

The EPA's position that life extension projects would not be significantly affected was again acknowledged in 1995. The EPA's Assistant Administrator for Air and Radiation stated in response to an industry proposal to add a "restoration" exemption to the NSR programs that the EPA's position was that the "routine maintenance exclusion already included in the existing NSR regulations ... has the effect of excluding 'routine restorations'" from the requirements of the NSR programs. ("EPA's Response to Issues Raised by Industry on Clean Air Act Implementation Reform," *attached to* Letter from Nichols to Lewis (May 31, 1995) at 19 (Duke Energy Ex. 46).)

■ The EPA's position on WEPCO's life extension project and life extension projects in general confirms the under-standing that projects which are routine in the industry qualify as RMRR. To reconcile the EPA's previously stated position with its litigation position that RMRR applies only to routine activities performed at an individual unit, one must assume that a generating unit routinely and repetitively undergoes life extension projects. This assumption defies common sense. Further, this is an assumption the EPA explicitly rejected when it assumed for the purpose of assessing future utility air emission trends that coal-fired generating utilities would undergo life extension refurbishment once around age thirty. (Duke Energy Ex. 40 at App. C.) Through the EPA's statements in the Federal Register, its statements to the regulated community and Congress, and its conduct for at least two decades the EPA has established an interpretation of RMRR under which routine is judged by reference to whether a particular activity is routine in the industry. *See Shell Offshore Inc. v. Babbitt,* 238 F.3d 622, 629 (5th Cir.2001) ("existing practice" evidence of current interpretation of regulation). Accordingly, "'[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking.'" *Alaska Prof'l Hunters Ass'n v. FAA,* 177 F.3d 1030, 1033–34 (D.C.Cir.1999) (quoting *Paralyzed Veterans of Am. v. D.C. Arena,* 117 F.3d 579, 586 (D.C.Cir.1997)).

D. *Application of the WEPCO multi-factor test*

The EPA in the WEPCO applicability determination identified a multi-factored

---

**14.** Before the report was issued, GAO sent a fact sheet about life extension listing most of the information to be included in the report and asked for the EPA's comments. (*See* Mem. from Tiber to Kete *et al.* (Apr. 10, 1990) (Duke Energy Ex. 93).) The fact sheet was widely distributed among the personnel in the Office of Policy, Planning and Evaluation. (*See id.*)

test that must be used to evaluate whether a proposed project qualifies as RMRR. The EPA characterizes Duke Energy's RMRR test as providing that "[i]f a project has ever been done before, it is 'routine maintenance'" and that "if a project has ever been performed by another utility, it is exempt." (EPA Reply Br. Supp. Mot. Partial Summ. J. at 4.) The WEPCO multi-factored test under this characterization of the approach advocated by Duke Energy would collapse the WEPCO test into a single inquiry—has this type of project been performed before. Because the WEPCO multi-factored test applies and is entitled to deference, the determination of RMRR cannot turn exclusively on whether a particular replacement project has ever occurred in the industry. If this were dispositive, it would render the PSD program a nullity.

The frequency with which a component is repaired or replaced within the industry, however, cannot be ignored. Nor can the frequency with which a component is repaired or replaced at a particular unit be conclusive. Rather, the WEPCO factors—nature and extent, purpose, frequency, and cost—must be analyzed and applied in reference to the source or industry category. For example, if a proposed project were estimated to cost $50 million dollars, that figure must be analyzed against what other projects within the industry have cost. If projects within the industry routinely cost $20 million, the $50 million cost of the proposed project may be one consideration in support of a finding that the project is not RMRR. This inquiry must be performed for each WEPCO factor.

■ The EPA has moved for partial summary judgment on the Buck 4 project on the basis that the work performed was not RMRR for that particular unit. At this stage in the litigation, the court cannot conclude that there is no genuine issue of material fact as to whether the project at Buck 4 was non-RMRR. Insufficient evidence has been provided regarding whether the project undertaken at Buck 4, given the specific nature and extent, purpose, frequency, and cost of the work, is routine in the electrical utility industry. The EPA applied the WEPCO factors to Buck 4 in arriving at its determination that the Buck 4 project does not qualify as RMRR. That analysis, however, was focused only on Buck 4. Consequently, a further analysis of the WEPCO factors must be performed in order to characterize the project at Buck 4. Once a case-specific analysis has been performed, it must be determined whether a project of that character is routine or not routine in the industry.

Duke Energy moves for summary judgment as to all its units, contending that the projects at these units were RMRR. Duke Energy, however, has not presented sufficient evidence to persuade the court that no reasonable trier of fact could conclude otherwise. Duke Energy has presented the reports of its experts who conclude that Duke Energy's projects involved RMRR. (Tuppeny Expert Report (Duke Energy Ex. 62); Bishop Expert Report (Duke Energy Ex. 64).) These reports provide no specific information, however, as to the number of units within the industry that have engaged in similar work, whether the costs of Duke Energy's projects were comparable to the costs of other similar industry projects, etc. The EPA's expert did concede to Duke Energy that other utilities within the utility industry were performing work similar to that performed by Duke Energy. (Koppe Dep. at 63 (Duke Energy Ex. 61).) This alone is not sufficient to establish RMRR. If it were, the utility industry would be the ultimate authority on what is and is not permissible.

■ Because there are factual issues which remain for trial, it is appropriate that the court provide the parties with guidance as to who bears the burden of proving whether Duke Energy's projects qualify as RMRR. As a general proposition, the party claiming the benefit of a statutory or regulatory exception bears the burden of proof. *See United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967); *United States v. Moore*, 613 F.2d 1029, 1044–45 (D.C.Cir.1979). This general proposition is just that; it is not dispositive. Rather, it is merely an interpretive aid to be used by the court in evaluating and allocating burdens of proof. *See United States v. McArthur*, 108 F.3d 1350, 1354 (11th Cir.1997) (characterizing rule as "merely [an] interpretative aid[ ]" to be considered along with "other indications of legislative will evident in the statute"). One court has expressed its view that the issue should be approached by drawing a distinction between an exception to a statutory prohibition and an exclusion from a statutory definition. *EEOC v. Chicago Club*, 86 F.3d 1423, 1429–31 (7th Cir. 1996) (stating that there is an "important distinction between an exception to the prohibition of a statute and an exclusion from the definition of entities covered by [the] statute"). The court believes this approach to be useful as it allows for the consideration of legislative intent.

The requirements of PSD are triggered by any physical change that results in an increase in emissions. 40 C.F.R. § 51.166(b)(2)(i) (1987) (Duke Energy Ex. 21). The EPA has defined physical change expansively, such as the simple repair of a leaky pipe. *WEPCO*, 893 F.2d at 905; 57 Fed.Reg. 32,314, 32,316 (July 21, 1992) (stating that the EPA has "always recognized" that the definition of physical change could "encompass the most mundane activities at an industrial facility (even the repair or replacement of a leaky pipe)"). The EPA's burden of proving a "physical change," therefore, is quite easy to satisfy. The EPA has also recognized, however, "that Congress obviously did not intend to make every activity at a source subject to new source requirements" and therefore "defined 'modification' in the NSPS and NSR regulations to include common-sense exclusions from the 'physical ... change' component of the definition." 57 Fed.Reg. at 32,316. For example, both NSPS and PSD regulations "contain similar exclusions for routine maintenance, repair, and replacement." [15] *Id.* Accordingly, the 1980 PSD regulations provide that "[a] physical change ... shall not include ... [r]outine maintenance, repair, and replacement." 40 C.F.R. § 51.166(b)(2)(iii)(a) (1987) (Duke Energy Ex. 21).

■ In light of the legislative intent not to include in the PSD requirements every activity and the EPA's exclusion of RMRR from the definition of physical change, the EPA should bear the burden of proving that Duke Energy's projects do not fall within this exemption. *See Chicago Club*, 86 F.3d at 1430–31 (explaining that where the "exclusion is incorporated in the definition" the defendant should not bear the burden of proving the exclusions application). To place the burden on Duke Energy would be in effect to sanction an almost

---

**15.** This exclusionary view is consistent with the EPA's historic understanding of the RMRR exemption. In the 1980 PSD regulations, the EPA stated, within a section entitled "Final Definitions of 'Major Modification' and 'Net Emissions Increase,' " that the statutory phrase " 'physical change' ... [did] not encompass certain specific types of events," including "routine maintenance, repair and replacement." 45 Fed.Reg. 52,676, 52,698 (Aug. 7, 1980) (Duke Energy Ex. 22).

*de facto* presumption of a PSD violation whenever a utility performs any type of work. This is especially true if the EPA applied the actual-to-potential emissions test, which always results in a net emissions increase, given the trivial showing necessary to prove a "physical change".[16] Congress, however, did not provide a presumption or anything approaching a presumption. The elements of a PSD violation, therefore, entail more than proving a physical change, which is no burden at all. It entails a showing that a utility engaged in a non-routine physical change that resulted in an increase in emissions. The EPA should appropriately bear the burden of making this showing at trial.

## IV. Net Emissions Increase

 Like the exemption for RMRR, the parties have presented two competing methods for quantifying emissions increases, both of which presumably stem from the 1980 PSD regulations.[17] The EPA advances as the correct method the "actual-to-projected-actual" test. Under this test, a source must predict a project's impact on hourly emissions rates and hours and rates of production, *i.e.*, capacity utilization. Duke Energy argues that the only method that can be applied to its projects is the "actual-to-actual" test. It contends that this is the test provided for under the 1980 regulations and that the test requires a comparison of pre-project actual emissions and future "actual" emissions, assuming constant hours and conditions of operation. The court finds, based on the PSD rules, the contemporaneous interpretations of the PSD rules, and the statutory language incorporating the NSPS concept of modification into PSD, post-project emissions must be calculated on an annual basis, measuring emissions in tons per year, and in calculating post-project emissions levels the hours and conditions of operation must be held constant. Accordingly, a net emissions increase can result only from an increase in the hourly rate of emissions.

### A. Plain language of increased hours exclusion

The permitting and pollution control requirements of PSD are triggered by a non-routine physical change at a source that results in a "significant net emissions increase." 40 C.F.R. § 51.166(b)(2)(i) (1987) (Duke Energy Ex. 21). In order to prove a "net emissions increase," the EPA must show an "increase in actual emissions from a particular physical change or change in the method of operation at a stationary source." *Id.* § 51.166(b)(3)(i)(a). For units that have begun normal operations, such as the units at issue in the case at bar, "actual emissions" is defined according to a pre-project (or baseline) period that is "representative of normal source operation." *Id.* § 51.166(b)(21)(ii).[18]

---

16. The EPA elected not to seek application of this test, although it did so not based on the validity of its position but for other considerations unknown to the court. *See infra* n. 17.

17. The EPA in its briefing argued that a third test, the "actual-to-potential" test should apply to Duke Energy's units. (EPA Mem. Supp. Mot. Partial Summ J. at 33–35.) Under the actual-to-potential test, the EPA assumes that a unit will operate at its maximum hourly rate of emissions and will do so continuously. Because no unit operates under these conditions, an emissions increase will always result. During the summary judgment hearing on July 18, 2003, the EPA indicated that it would not seek application of the actual-to-potential test but would rather pursue its contention that the emissions test under PSD requires consideration of both increased hourly rates and utilization. Accordingly, the court will not address the potential application of the actual-to-potential test.

18. "For any emissions unit which has not begun normal operations ... actual emissions shall equal the potential to emit of the unit ...." 40 C.F.R. § 51.166(b)(21)(iv) (1987)

Thus, a comparison between the pre-project levels of emissions and post-project levels of emissions is required to determine whether there has been a net emissions increase above the baseline levels.

The key to this comparison is how to calculate the post-project emissions levels. Because an increase in emissions must result from a "physical [or operational] change," which by definition excludes "[a]n increase in the hours of operation or in the production rate," *id.* § 51.166(b)(2)(iii)(f), post-project emissions levels must be calculated assuming the same pre-project "representative" conditions of operation, *i.e.,* hours and rates of production. Under the 1980 PSD regulations, therefore, only if the project increases the hourly rate of emissions will there be an annual emissions increase.

The EPA asserts that the increased hours exclusion applies only to exclude increased utilization where the increased utilization is not associated with a construction project. Thus, whenever there is an increase in utilization coupled with a physical change, any increase in hours of operation and production rates may be considered in the emissions calculus. Such a limitation on the application of this exclusion, however, is not provided for in the plain text of the regulations. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). The only limitation on the increased hours exemption provided for in the regulations is that any increase in hours or rates cannot otherwise be prohibited by a federally enforceable permit.[19] 40 C.F.R. § 51.166(b)(2)(iii)(f) (1987) (Duke Energy Ex. 21). Nevertheless, the EPA contends that its interpretation of this exemption is reasonable and therefore entitled to defer-ence. The court, however, cannot simply defer to the EPA's interpretation when that interpretation imposes an additional condition on a regulatory exemption. *See Christensen v. Harris County,* 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

B. *EPA's historic interpretation of increased hours exclusion*

The court cannot defer to the EPA's interpretation when it is clearly contrary to earlier interpretations. Immediately after the promulgation of the PSD regulations in 1980, the EPA's Director of the Division of Stationary Source Enforcement ("DSSE"), Edward E. Reich, confirmed in two separate applicability determinations that the requirements of PSD would be implicated only by an increase in the hourly rate of emissions. In a June 24, 1981, applicability determination, Reich wrote that "PSD applicability [at a previously operating source] is determined by evaluating any change in the [hourly] emissions rates caused by" the physical or operational change being examined. (Letter from Reich to Gill (June 24, 1981) (Duke Energy Ex. 23).) Because the available data indicated that there would be no increase in the hourly rate of emissions following the contemplated change, Reich concluded that "[a]ctual emissions could increase only if there [was] an increase in the production rate or hours of operation, both of which are specifically exempt from PSD review." (*Id.*) This determination reconfirmed an earlier PSD applicability determination in which Reich stated that increased hours of

---

(Duke Energy Ex. 21). Neither party seeks to apply this standard to the units at issue.

**19.** It is undisputed that Duke Energy's units are not subject to permit limitations on hours or rates of production.

operation, even when coupled with a physical or operational change, would not be considered a modification. (Mem. from Reich to Whitmore (Jan. 22, 1981) (Duke Energy Ex. 24).) Thus, absent an increase in the maximum hourly rate of emissions, the mandates of PSD are not implicated.

■ Once an agency issues a determination or ruling, it "'must either follow its own precedents or explain why it departs from them.'" *Puerto Rican Cement Co. v. United States EPA*, 889 F.2d 292, 298 (1st Cir.1989) (quoting *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 36 (1st Cir. 1989)). The EPA attempts to explain why it has not followed its precedent by dismissing these determinations as "erroneous" and mere "dicta." Reich as the Director of the DSSE, however, was not a low-level employee from an irrelevant division opining as to what he believed the appropriate interpretation of the EPA regulations should be. Rather, he was the head of the division at the EPA responsible for "provid[ing] guidance for interpretations which address the implementation of [the PSD] regulations." (Mem. from Reich to Devine (Feb. 13, 1978) (Duke Energy Ex. 143).) "[EPA] policy require[d] that DSSE . . . make the final recommendation for interpretation of these requirements." (*Id.*) Accordingly, these contemporaneous interpretations provide compelling evidence of the rules' original meaning and cannot simply be ignored out of blind deference to the EPA's current interpretation. *Ohio Dep't of Human Servs. v. United States Dep't of HHS*, 862 F.2d 1228, 1234–35 (6th Cir.1988).

### C. *Legislative intent*

The interpretation that requires an increase in the hourly emissions rate and the exclusion of any increase in the hours of operation is not only consistent with the plain language of the regulations and the EPA's contemporaneous interpretations, but is also consistent with the NSPS definition of "modification" which was incorporated by explicit reference into PSD.[20] The PSD program provides that "[n]o major emitting facility on which *construction* is commenced . . . may be constructed in any area to which this part applies unless—(1) a permit has been issued." 42 U.S.C. § 7475(a)(1) (1995) (emphasis added). The term "construction" is defined to "include[ ] the modification (as defined in section 7411(a) of this title [NSPS]) of any source or facility." *Id.* § 7479(2)(C). An NSPS modification requires a physical or operational change and an increase in the unit's maximum hourly rate of emissions. *Id.* § 7411(a)(4); 40 C.F.R. § 60.14(a) (1975) (Duke Energy Ex. 6). Thus, in order to undergo "construction" as defined in PSD, an existing source must also undergo a "modification" as defined in NSPS,[21] *i.e.*, to undergo PSD construction

---

**20.** *See* 123 Cong. Rec. H11956, 3665 (daily ed. Nov. 1, 1977) (Duke Energy Ex. 13) (explaining that Congress intended "to conform" the NSR definition of "modification" to the "usage in other parts of the Act," namely NSPS). EPA interpreted this reference to "usage" to "mean that for PSD purposes Congress intended the term modification to include all exemptions included in the NSPS regulations promulgated . . . prior to the date of [PSD's] enactment." (Duke Energy Ex. 16).

**21.** In 1975, the EPA revised the NSPS regulations to clarify that the modification definition applied to an increase "in emissions rate," "expressed as kg/hr." 40 Fed.Reg. 58,416, 58,419 (Dec. 16, 1975) (Duke Energy Ex. 7). The EPA explained that the unit of measurement would clarify that the modification rule would be sensitive to "increased production capacity and to the overall increase in total emissions to the atmosphere," *i.e.*, to new capacity to emit pollution, while "automatically allow[ing] increases in operating hours as intended by one of the existing exemptions

a physical change must result in an increase in the hourly rate of emissions.

Under the emissions standard advanced by the EPA under the 1980 regulations, however, a physical change at an existing source that does not increase the source's hourly emissions rate, thereby implicating NSPS, could nonetheless trigger PSD based on a projected increase in hours of operation. Accordingly, an existing source would be considered modified under PSD even in the absence of an NSPS modification at that source. This interpretation of the regulations is inconsistent with the congressional design of defining PSD construction in terms of NSPS modification and should therefore be accorded little deference. *See Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (stating that no weight can be given to a regulatory interpretation that would "violate the Constitution or a federal statute").

The EPA contends that an emissions test for PSD that excludes from its calculations any emissions caused by an increase in the hours of operation ignores the critical differences between NSPS and PSD. Further, the EPA argues, this construction of the emissions test renders the PSD test indistinguishable from the NSPS test. While NSPS is focused on technology requirements for source categories, PSD requirements focus on the location of the source and its potential impact on air quality in that locality. *Northern Plains Res.*

*Council v. United States EPA,* 645 F.2d 1349, 1356 (9th Cir.1981). An hourly emissions rate test, however, contrary to the EPA's assertion, does not ignore the objectives of each program and does not render the test for each program indistinguishable.

PSD may be triggered if there is an increase in the maximum hourly emissions rate. In this regard, the PSD and NSPS emissions tests are similar. Unlike NSPS which is always triggered whenever there is an increase in the hourly rate of emissions, PSD is potentially triggered when there is an increase in the hourly emissions rate but only if the annualized emissions increase: (1) exceeds the significance levels in 40 C.F.R. § 51.166(b)(23) and (2) is not offset by contemporaneous decreases at the source, *id.* § 51.166(b)(3). These two conditions for PSD applicability—significance levels and netting—effectuate the air quality purpose of the PSD program. *See Alabama Power Co. v. Costle,* 636 F.2d 323, 401 (D.C.Cir.1979) (explaining that PSD is concerned only with air quality and thus requires netting). These conditions also explain why emissions under PSD must be calculated on an annual basis: measuring emissions in tons per year makes possible netting (addition and subtraction) of emissions rates between various units at a plant.[22]

While courts have construed some of the same terms used in NSPS and PSD in

under 40 CFR 60.2(h)." 39 Fed.Reg. 36,946, 36,947 (Oct. 15, 1974) (Duke Energy Ex. 8).

**22.** The netting provisions of PSD state:
The first step in determining whether a "net emissions increase" would occur is to determine whether the physical or operational change in question would itself result in an increase in "actual emissions." If it would not, then it could not result in a "net emissions increase." If it would, the second step is to identify and quantify any other

prior increases and decreases in "actual emissions" that would be contemporaneous with the particular change and otherwise creditable. The third step, finally, is to total the increase from the particular change with other contemporaneous increases and decreases. If the total would exceed zero, then a "net emissions increase" would result from the change.
45 Fed.Reg. 52,676, 52,698 (Aug. 7, 1980) (Duke Energy Ex. 22).

different ways, these decisions do not compel a similar result here. In fact, the explicit reference by Congress incorporating the concept of NSPS modification into the PSD concept of construction compels the result that PSD is triggered only by an increase in a unit's hourly emissions rate.

In *Northern Plains,* the court upheld the EPA's interpretation of the term "commenced," which was defined differently under NSPS and PSD. 645 F.2d at 1354–57. The court examined the regulatory history, statutory provisions, and legislative history of the term and concluded that there was "no manifest congressional intent" to apply the same definition of "commenced" under both NSPS and PSD. *Id.* at 1355. Significantly, the court observed that "commenced" was not defined in the 1970 CAA Amendments but was instead defined in 1971 by an NSPS regulation. *Id.* Accordingly, the court rejected the argument that the term should be given the same meaning under both programs because when Congress enacted PSD in 1977, it explicitly defined "commenced" in the statute differently from the pre-existing NSPS definition and "expressly limited [the PSD definition] by the introductory phrase 'For purposes of this part—' to Part C of the Act, *i.e.,* the statutory PSD program." *Id.*

The court in *Alabama Power* similarly relied on the statutory language in holding that the EPA had the authority to "adopt definitions of the component terms of 'source' that are different in scope from those that may be employed for NSPS ... due to differences in the purpose and structure of the [NSPS and PSD] programs." 636 F.2d at 397–98. The decision, however, was not based solely on the different objectives of the two programs. Rather, it was based in large measure on the differences in the statutory language

used in NSPS and PSD to describe the term "source." *Compare* 42 U.S.C. § 7411(a)(3) (1995) (NSPS) (defining the term "source" to mean "any building, structure, facility, or installation") *with id.* § 7479(1)(PSD) (defining the term "source" to include "fossil-fuel fired steam electric plants ..., coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, ... [and] iron and steel mill plants"). This reference to "entire plants" in PSD, according to the court, demonstrated that "Congress clearly envisioned" that the term "source" should be given a different construction under PSD than NSPS, which applies to individual units. *Alabama Power,* 636 F.2d at 397.

In stark contrast to these cases in which there was a clear congressional intent to treat similar terms differently, Congress clearly manifested its intent that the definition of "modification" should be given the same construction under NSPS and PSD. The CAA defines the term "modification" in only one place: 42 U.S.C. § 7411(a)(4) (NSPS). Seven years later, when Congress enacted PSD, it explicitly defined the application of PSD according to the NSPS definition of modification. Furthermore, Congress expressly stated that it intended "to conform" the PSD definition of "modification" to the "usage" of that term under NSPS. 123 Cong. Rec. H11956, 3665 (daily ed. Nov. 1, 1977) (Duke Energy Ex. 13). This court cannot envision a clearer indication of Congress's intent to trigger PSD only when NSPS is likewise triggered by an increase in the maximum hourly emissions rate.

#### D. *WEPCO emissions test*

The Seventh Circuit in *WEPCO,* the only appellate court[23] to date that has

---

**23.** The court in *Ohio Edison* rejected the position that PSD is potentially triggered only by

an increase in maximum hourly rates of emissions. 276 F.Supp.2d 829, 855–57, 2003 WL

considered this issue, similarly concluded that for a source that has begun normal operations, PSD is potentially triggered only when there is an increase in the maximum hourly rate of emissions. *WEPCO,* 893 F.2d at 915–18. The EPA in WEPCO found that the replacements WEPCO proposed would increase "[p]lantwide capacity ... about 40 percent above current levels." (Duke Energy Ex. 31.) As such, the EPA reasoned that to increase the capacity of some WEPCO units in a way that increases their maximum achievable hourly emissions rates triggered NSPS. (EPA Ex. 73 at 11.) The *WEPCO* court affirmed this determination. *WEPCO,* 893 F.2d at 913–15.

In calculating the PSD emissions increases, the EPA sought to apply the "actual-to-potential" test to units that had undergone like-kind replacements. Under this approach, the EPA compared the actual annual emissions of the units during a pre-project representative period to the units' theoretical, total annual emissions, which presumes that the units operate at their maximum hourly emissions rate, twenty-four hours a day, 365 days a year. The EPA reasoned that because the source " 'ha[d] not yet begun operations following the renovation, "actual emissions" following the renovation [were] deemed to be the source's "potential to emit." ' " *WEPCO,* 893 F.2d at 916 (quoting Clay Mem. at 7).

The court rejected this approach and concluded that there was "no support in the regulations for the EPA's decision wholly to disregard past operating conditions at the plant." *Id.* at 917. On remand, the court ordered the EPA to determine "whether the renovated plant would

cause a significant net emissions increase if it were operated under present hours and conditions." *Id.* at 918 n. 14. This remand instruction explicitly sets forth the "actual-to-actual" test advocated by Duke Energy and previously applied by the EPA. (*See supra* § IV.B.) This test requires that the hours and conditions of operation be held constant and places the focus on an increase in the hourly emissions rate.

The EPA contends that the *WEPCO* remand instruction does not require application of the actual-to-actual test. Instead, it asserts that if the *WEPCO* court agreed with the formulation of the emissions test proposed by Duke Energy, there would have been no need to remand the case, citing the court's acknowledgment that the EPA had " 'assumed that emissions increases at Port Washington would come not from an increase in emission rate, but rather from increases in production rate or hours of operation.' " *WEPCO,* 893 F.2d at 916 (quoting Supplemental Determination at 9). Thus, the EPA argues, had the court agreed that the hours of operation must be held constant, it would have decided, based on the EPA's assumption about emissions rates, that PSD did not apply.

While the court arguably may have ignored an assumption by the EPA in providing its remand instruction, it did not ignore the specific facts of the case. It was undisputed that the WEPCO replacement projects resulted in the restoration and increase in the maximum capacity (*i.e.,* hourly emissions rate) of the restored units. *Id.* at 910. Furthermore, the court upheld the EPA's determination that NSPS applied because of an increase in

21910738, at *44–47. Instead, the court accepted the EPA's position that emissions increases under PSD should be calculated considering both an increase in the hourly rate of

emissions and an increase in utilization. *Id.* 276 F.Supp.2d at 850–52, 2003 WL 21910738 at *35–39. This court respectfully disagrees with this conclusion.

the units' maximum hourly rate of emissions. *Id.* at 913–15. However, even with the determination that the renovation caused an increase in the hourly rate of emissions a remand was necessary to determine whether that increase in emissions would exceed the PSD significance levels, and thereby trigger PSD.[24]

Following the remand, the EPA failed to calculate the PSD emissions levels as instructed by the Seventh Circuit. Instead it calculated post-project emissions levels by predicting future utilization of the plant. The EPA recognized that the remand instruction could be interpreted to require that hours of operation be held constant but dismissed this interpretation as "incorrect." (Letter from Rosenberg to Boston (June 8, 1990) at 6 (Duke Energy Ex. 33).) Similarly, an EPA attorney noted on an internal EPA memorandum about the *WEPCO* remand instruction that " '[p]resent h[ou]rs' is absurd. EPA properly ignored it in [the] WEPCO remand." (Mem. from Rivkin to Wakefield (Feb. 26, 1991) at 14 (Duke Energy Ex. 140).)

Because the 1980 regulations do not provide for the actual-to-projected-actual test, the EPA relies on its interpretation of the *WEPCO* decision, in which the court stated that the EPA could not "wholly . . . disregard past operating condition," *WEPCO*, 893 F.2d at 917, to support its actual-to-projected-actual test. Based on its interpretation of this language, the EPA asserts that its decision to include in the PSD emissions test any increase in utilization should be given deference. While deference to the EPA's interpretations of the CAA's Amendments and its technical regulations is typically substantial, *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986); *Chevron U.S.A.*, 467 U.S. at 844, 104 S.Ct. 2778, a similar deference in not warranted when what is being interpreted is the language of a judicial opinion. This is a task the court is equally able to perform.

The EPA does not rely on the language of the 1980 PSD regulations to support its method of calculating post-project emissions. Nowhere in the regulations is there a reference to an actual-to-projected-actual test or to increased utilization. In fact, the EPA admitted as much in its WEPCO applicability determination. WEPCO argued to the EPA that the EPA should "compare representative actual emissions prior to the change with 'projected' actual emissions after the renovation." (EPA Ex. 73 at 7 n. 4.) The EPA concluded that "[t]he PSD regulations provide no support for this view." (*Id.*) More recently, the EPA's proffered expert on PSD regulations indicated that the tests he applied, which are variations of the actual-to-projected-actual test, were "not set forth in the 1980 rules" but were "plausible approaches." (Sahu Dep. at 156 (Duke Energy Ex. 66); Sahu Expert Report at 39, 41 (Duke Energy Ex. 110).) The EPA, however, cannot lawfully apply a standard not provided for in the regulations on the premise that it is a plausible approach. *See Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C.Cir.1979) ("It has become axiomatic that an agency is bound by its own regulations. The fact that a regulation as written does not provide [the agency] a quick way to reach a

---

24. The PSD's applicability could not be determined by the court because "WEPCO never submitted pollutant-specific data to the EPA. Consequently, the EPA could not, at the time the matter was before it, conclude whether the renovated plant would cause a significant net emissions increase if it were operated under present hours and conditions." *WEPCO*, 893 F.2d at 918 n. 14 (citation omitted). Accordingly, the court directed that "WEPCO should make such data available so that the EPA can determine on that basis whether the Port Washington plant will be subject to the PSD program." *Id.*

desired result does not authorize it to ignore the regulation or label it 'inappropriate.' ").

The fact that the 1980 PSD regulations do not provide the methodology the EPA seeks to apply is further highlighted by the EPA's decision to add through notice-and-comment procedures the very methodology it now contends the 1980 regulations provide. In 1992 the EPA promulgated the "WEPCO rule." [25] *See* 40 C.F.R. § 51.166(b)(21)(v), (b)(32) (2002); 57 Fed. Reg. 32,314 (July 21, 1992). Under this rule, post-project actual emissions for the purpose of triggering PSD at utilities are equal to "representative actual annual emissions," which are generally defined as "the average rate, in tons per year, at which the source is projected to emit a pollutant for the two-year period after a physical change." 57 Fed.Reg. at 32,335. In calculating any increase in emissions, the regulations require consideration of the "effect any change will have on increasing or decreasing the hourly emissions rate and on projected capacity utilization." *Id.* The addition of the new WEPCO Rule appears to have been unnecessary if the 1980 regulations already provided this method.

In sum, the 1980 PSD regulations require that in calculating post-project emissions, the EPA must hold the pre-project and post-project hours and conditions of operation constant. This is the formulation dictated by the plain language of the 1980 regulations, the EPA's contempora-

neous interpretations of those regulations, and the statutory and regulatory framework of the PSD program.

E. *Application of the "actual-to-actual" emissions test*

Duke Energy contends that because the EPA does not allege an increase in the hourly rate of emissions for any of its units following the projects, the EPA cannot establish a "net emissions increase" and it is therefore entitled to summary judgment on all claims. The EPA has alleged, however, that following the project at Buck 4 there was an increase in Buck 4's hourly rate of emissions above its baseline rate. This is principally due to the fact that Buck 4 was in ECS for approximately ten years. Accordingly, the EPA asserts that its baseline emissions rate is zero.

In calculating the baseline emissions rate, the regulations provide that "[i]n general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation." 40 C.F.R. § 51.166(b)(21)(ii) (1987) (Duke Energy Ex. 21). Duke Energy argues that because Buck 4 was shutdown for economic reasons, the baseline period of normal source operation occurs during the period of actual operation preceding the shutdown. Therefore, because its post-project emissions rate did not in-

---

**25.** The WEPCO Rule provisions providing an actual-to-projected-actual test do not apply to the projects at issue. The WEPCO Rule was not incorporated into the North Carolina SIP until December 4, 1995, and into the South Carolina SIP until July 8, 2002. *See* 60 Fed. Reg. 51,923 (Oct. 4, 1995) (EPA Ex. 127); 67 Fed.Reg. 30,594 (May 7, 2002) (EPA Ex. 128). The EPA enforces the SIP's rule until the SIP is revised. *General Motors Corp. v. United*

*States,* 496 U.S. 530, 540, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990). However, even for projects undertaken after the dates in which the WEPCO Rule was adopted, Duke Energy " 'opted out' of the WEPCO calculus" by failing to satisfy the regulatory prerequisite of submitting emissions data for a five-year period following the physical change. (EPA Mem. Supp. Partial Summ. J. at 35 n. 14.)

crease above this pre-project level, PSD is not triggered. ·

Under the 1980 regulations, the EPA has historically presumed that the two · years immediately preceding a change should be used to calculate the baseline. 45 Fed.Reg. 52,676, 52,705 (Aug. 7, 1980) (EPA Ex. 122). This interpretation has been applied on previous occasions. (*See, e.g., In re Monroe Elec. Generating Plant,* Petition No. 6–99–2 slip op. 14–16 (U.S. EPA 1999) (EPA Ex. 116) ("[I]n calculating the net emissions increase for reactivation of long-dormant sources potentially subject to PSD, the source is considered to have zero emissions as its baseline."); Letter from Howekamp to Connery (Nov. 6, 1987) at 8 (Cyprus Casa Grande Applicability Determination) (EPA Ex. 159).) [26] For example, in the Cyprus Casa Grande PSD applicability determination, the EPA concluded that the emissions during the two-year period preceding the start-up of the plant were zero and that "this period [was] representative of normal operations, since the emissions [had] been zero during each of the last ten years while the plant [had] been shut down." (EPA Ex. 159 at 8.)

The regulations provide, however, that "[t]he reviewing authority may allow the use of a different time period upon a determination that it is more representative of normal source operation." 40 C.F.R. § 51.166(b)(21)(ii) (1987) (Duke · Energy Ex. 21). The EPA has indicated that the discretion to depart from the zero baseline presumption for long-dormant facilities is narrow and generally limited to extraordinary occurrences. Duke Energy argues that the agency interpretation of the regulations that controls the baseline level is the North Carolina Department of Envi-

ronmental and Natural Resources' ("NCDENR") interpretation.

In 1982, the EPA approved North Carolina's PSD rules, thereby authorizing the State "to issue and enforce PSD permits for sources locat[ed] in [North Carolina]." 47 Fed.Reg. 7836 (Feb. 23, 1982) (Duke Energy Ex. 26). Duke Energy argues, therefore, that the NCDENR's interpretation of North Carolina's PSD rules governs what period should be used to calculate pre-project baseline · emissions levels. Accordingly, Duke Energy refers to the testimony of John Evans, the head of the NCDENR, in which he stated that, under North Carolina PSD regulations, NCDENR considers the last two years of operation preceding the shutdown as the representative baseline period for any physical change that might have occurred during the shutdown. (Evans Dep. at 11–12 (Duke Energy Ex. 146).)

The EPA asserted during oral argument that this evidence was irrelevant because Duke Energy never requested from the appropriate authority a different baseline. Thus, according to the EPA, Duke Energy cannot argue, *ex post,* that it should be allowed a different representative period. Whether Duke Energy can request a different baseline after the project has been completed and an enforcement action has been initiated will not be decided by the court at this time. Assuming only for purposes of summary judgment that Duke Energy may make such an *ex post* request, there exists at a minimum a question of fact as to whether Duke Energy can make the necessary showing that a different baseline is more representative of normal source operations. If it is ultimately successful in making such a showing, the EPA must then prove, as it must for all pro-

---

**26.** *See also* 61 Fed.Reg. 38,250, 38,254 (July 23, 1996) (EPA Ex. .130) ("The EPA has historically used the 2 years immediately preced-

ing the proposed change to establish the baseline. However, in some cases it has allowed use of an earlier period." (citation omitted)).

jects, that the Buck 4 project caused the unit's hourly emissions rate to increase above its baseline rate. For this reason, the court cannot grant either parties' motion for summary judgment as to Buck 4. As to the other twenty-eight projects, given the size and complexity of the record, the court will defer ruling on whether these projects resulted in an increase in emissions above the baseline rate. To the extent the projects did not increase the unit's maximum hourly rate of emissions, however, these projects are not subject to PSD.

## V. *Statute of Limitations*

The EPA, pursuant to 42 U.S.C. § 7413(b)(2), seeks civil penalties up to $25,000.00 per day of violation for violations occurring on or before January 30, 1997, and $27,500.00 per day of violation for violations occurring after January 30, 1997, and injunctive relief pursuant to 42 U.S.C. §§ 7413(b), 7477. Duke Energy, on August 20, 2001, moved for partial judgment on the pleadings. According to Duke Energy, its alleged failure to comply with the preconstruction permit requirements resulted in discrete violations that were complete at the time of actual construction. Thus, any claim for civil penalties resulting from alleged modifications that occurred more than five years prior to the filing of this lawsuit are barred by the applicable statute of limitations. The EPA and Intervenor–Plaintiffs, on the other hand, contend that any civil penalties arising from these alleged modifications are not time barred because Duke Energy's failure to obtain a preconstruction permit and subsequent operation of the plants constitute a continuing violation. They accordingly move for summary judgment on

this defense by Duke Energy. The EPA and Intervenor–Plaintiffs also seek a determination as to whether the applicable statute of limitations bars the imposition of injunctive relief.

### A. *Civil penalties*

The CAA does not provide a specific statute of limitations applicable to alleged violations of its provisions. Accordingly, the general federal statute of limitations for civil enforcement actions applies. The general federal statute of limitations provides in part that "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462 (1994). The EPA filed its complaint on December 22, 2000. Therefore, unless Duke Energy's alleged modifications and subsequent operation of its generating facilities constitute continuing violations, any civil penalties arising from alleged violations of the CAA before December 22, 1995, are barred by the five-year statute of limitations.

Duke Energy argues that a claim "first accrues" under 28 U.S.C. § 2462 on the date that a violation first occurs. *See 3M Co. v. Browner*, 17 F.3d 1453, 1462 (D.C.Cir.1994) ("the term 'accrued' in § 2462 has been taken to mean that the running of the limitations period in penalty actions is measured from the date of the violation"). Duke Energy further contends that it is well settled that violations of preconstruction permitting requirements occur when actual construction is commenced at the facility, and not at some later time.[27] *See, e.g., United States v.*

---

**27.** This position has emerged as the majority rule. This court, however, is not bound by

the interpretation adopted by these courts.

*Westvaco Corp.,* 144 F.Supp.2d 439, 443 (D.Md.2001); *United States v. Murphy Oil USA, Inc.,* 143 F.Supp.2d 1054, 1083–84 (W.D.Wis.2001); *United States v. Louisiana–Pacific Corp.,* 682 F.Supp. 1122, 1130 (D.Colo.1987). Therefore, according to Duke Energy, any civil penalties arising from modifications commenced before December 22, 1995, are time barred.

The Supreme Court has held that statutes of limitations do not bar claims for continuing violations. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) ("Statutes of limitations ... are intended to keep stale claims out of the courts. Where the challenged violation is a continuing one, the staleness concern disappears." (citation omitted)). In order to determine whether Duke Energy's alleged failure to obtain a preconstruction permit constitutes a continuing violation, the court must determine whether these alleged violations constitute a discrete, single violation (*i.e.,* at the time of construction) or whether any aspect of "the detrimental effect to the public and the advantage to the [defendant] continue." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 231, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975).

The preconstruction requirements of PSD provide in part:

> No major emitting facility on which construction is commenced ... may be constructed in any area to which this part applies unless—(1) a permit has been issued for such proposed facility in accordance with this part *setting forth emission limitations* for such facility which conform to the requirements of this part.

42 U.S.C. § 7475(a)(1) (1995) (emphasis added). Courts which have held that the statute of limitations operates to bar claims more than five years old focus on the language regarding construction. *See,*

*e.g., Westvaco,* 144 F.Supp.2d at 444–45. They also rely on the fact that the PSD permitting process entails conducting extensive impact analysis prior to construction. *See, e.g., United States v. Southern Ind. Gas & Elec. Co.,* 2002 WL 1760752, at *5 (S.D.Ind. July 26, 2002). These courts, however, focus on these aspects of the PSD permit process to the exclusion of the language in the statute stating that the PSD permit shall set forth emission limitations for that source following the construction activity. Yet this aspect of the PSD permitting process and compliance with these emission limitations is just as integral to achieving the objectives of PSD as the preconstruction analysis and review. Thus, facilities contemplating undergoing a modification must obtain a PSD permit prior to construction and, following construction, operate in accordance with the terms of that permit.

In an earlier decision, this court held that obtaining a preconstruction permit that sets forth emission limitations amounts to a condition of operation in the context of determining whether Intervenor–Plaintiffs were entitled to intervene as a matter of right under 42 U.S.C. § 7604(b)(1)(B). *United States v. Duke Energy Corp.,* 171 F.Supp.2d 560 (M.D.N.C.2001). Although this court is not limited by its earlier decision, there is no reason to depart from this holding in deciding whether claims for civil penalties for an alleged violation of PSD preconstruction permitting requirements are barred by the statute of limitations.

Determining the emission limitations involves the application of best available control technology ("BACT") for pollutants emitted by the particular facility. *See* 42 U.S.C. § 7475(a)(4) (1995). This determination is done on a case-by-case basis, taking into account "energy, environmental, and economic impacts and other costs."

*Id.* § 7479(3). As such, the implementation of BACT is a condition of operation and the Administrator or State may bring an enforcement action seeking injunctive relief for the alleged failure to apply best available technology. *See id.* § 7477. Thus, the requirement of obtaining a preconstruction permit amounts to a condition of operation and establishes ongoing obligations.

The permitting process involves not only preconstruction review but also the determination of BACT, *i.e.*, the setting of emission limitations, and absent the proper implementation of BACT a source operator may be enjoined from operating. This ability to enjoin an operator fulfills the intended purpose of PSD by preventing the emission of excess air pollutants which would otherwise be prohibited by a PSD permit. *See United States v. Ohio Edison Co.*, No. 2:99–CV–1181, at *12 (S.D.Ohio Jan. 17, 2003) (EPA Ex. 112) (holding that penalties for failure to obtain a PSD permit were not time-barred because "the PSD provisions contemplate not only certain preconstruction obligations but also subsequent operation after modification"); *United States v. American Elec. Power Serv. Corp.*, 137 F.Supp.2d 1060, 1066 (S.D.Ohio 2001) (stating that it is "illogical to conclude that a defendant may only be held liable for constructing a facility, rather than operating such facility, without complying with the [PSD] permit requirements").

The difficulty courts have encountered in determining whether the PSD permits contain both construction and operation obligations stem in large part from the inclusion of both types of permits under the CAA. The Fifth Circuit stated that "[t]he CAA statutory scheme contemplates at least two different types of air permits unhappily named 'preconstruction permits' and 'operating permits,' with confusion easily resulting from the fact that preconstruction permits often include limits upon a source's operations." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1355–56 (5th Cir.1996). But because the PSD permitting provisions provide both preconstruction obligations and subsequent obligations on operations, Duke Energy's alleged violation of failing to undergo the PSD permitting process does not terminate upon the completion of construction activity. The violation continues because each day that Duke Energy operates an allegedly modified plant and emits pollutants into the atmosphere, it may be in violation of the requirement to comply with the operation conditions, *i.e.*, the emission limitations, that would have been contained within a PSD permit had Duke Energy submitted to the permitting process.

Duke Energy argues, however, and several courts have agreed, that any permits relating to conditions of operation fall under Title V of the Act, 42 U.S.C. §§ 7661a–7661f, and that the PSD provisions address only construction and modification requirements. Yet Duke Energy concedes that "PSD permits can contain conditions relating to operations of a source," but argues that this is not the "asserted basis of liability in this case. Rather, the issue in this case is whether Duke [Energy] was obligated to get permits *before* undertaking the projects at issue." (Duke Energy Br. Reply Supp. Mot. Partial Judg. on Pleadings Against Plaintiff–Intervenors at 6.) Duke Energy contends, therefore, that any PSD requirements that impose operating conditions are displaced by the existence of operating permits under Title V of the Act.

Despite Duke Energy's argument otherwise, the Title V operating permit program does not supplant the PSD program. Title V does not establish additional substantive requirements, but merely brings together

applicable requirements, such as the PSD provisions, into one permitting scheme. 57 Fed.Reg. 32,250, 32,251 (July 21, 1992). Title V explicitly states that compliance with a Title V permit is not "deemed compliance with other applicable provisions" of the Act unless a permit explicitly incorporates those other provisions or those provisions have been formally determined to be inapplicable. 42 U.S.C. § 7661c(f) (1995). Furthermore, Title V states that "[n]othing in this subsection shall be construed to alter the applicable requirements ... that a permit be obtained before construction or modification." *Id.* § 7661a(a). In fact, sources that have applied for (but not yet received) Title V permits are generally given temporary protection with the exception of sources that are not in compliance with applicable construction or modification permit requirements. *Id.* § 7661b(d).

Courts adopting the majority view have supported their position by relying on the fact that the SIP of a particular state may have a separate construction and operation permitting scheme. *See, e.g., United States v. Campbell Soup Co.*, 1997 WL 258894, at *1–3 (E.D.Cal. Mar. 11, 1997). To the extent that this is relevant, and the court has reservations that it is, that rationale has no application to the case at bar. Both the SIP of North Carolina and South Carolina contain an integrated construction and operation permit. North Carolina's permit procedures provide that "a new, modified, or existing facility or source shall not begin construction or operation without first obtaining a *construction and operation* permit."[28] N.C. Admin. Code tit. 15A, r.2Q.0301 (emphasis added). The SIP of South Carolina states that "[a]ny owner or operator who *constructs*

or *operates* a source or modification not in accordance ... with the terms of any approval," which includes emission limitations, is subject to enforcement action. 61 S.C.Code Ann. Regs. 62.5, No. 7(r)(1) (emphasis added).

Holding that Duke Energy's alleged failure to obtain a preconstruction permit constitutes a continuing violation is consistent with the purpose of the CAA and the PSD provisions. The fundamental purpose of the CAA is to "speed up, expand, and intensify the war against air pollution in the United States." H.R.Rep. No. 91–1146, at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356, 5356. Yet Duke Energy's position that a violation of PSD is a discrete act that occurs only as long as the construction would not achieve these objectives. Rather, it would convert the PSD program, which is aimed at protecting air quality, into the " 'Prevention of Significant Delay in construction' " program. (EPA Mem. Supp. Mot. Partial Summ. J. at 39.) Because penalties could be accessed only according to the duration of unpermitted construction, it could in certain circumstances be more cost-effective to avoid the permit obligations altogether and, if challenged, litigate the claim endlessly with little incentive to settle and no downside risk of an increasing fine. Accordingly, because the requirement of obtaining a preconstruction permit amounts to a condition of operation, Duke Energy's alleged failure to obtain a preconstruction permit under Section 7475 and applicable SIP provisions constitutes a continuing violation and the EPA's claims for civil penalties are therefore not

---

**28.** The requirement of a unitary or dual purpose permit for PSD applicability was confirmed in a letter from the North Carolina Chief of Air Quality to the EPA. It stated that "all Air Quality Permits issued in North Car-

olina by the Division of Environmental Management will be a combined 'construction and operation' permit." (Letter from Johnson to Miller (Apr. 16, 1986) (EPA Ex. 113).)

barred.[29]

## B. *Injunctive relief*

 In addition to seeking summary judgment on Duke Energy's defense that civil penalties for certain projects are barred by the statute of limitations, the EPA and Intervenor–Plaintiffs move for summary judgment on Duke Energy's defense that the statute of limitations bars injunctive relief on projects completed more than five years prior to the filing of this suit. By its plain terms, the general federal statute of limitations has no application to injunctive relief. It pertains only to actions for "any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462 (1994). The CAA, moreover, specifically provides for both a "civil penalty" and a separate "permanent or temporary injunction." 42 U.S.C. §§ 7413(b), 7477 (1995). Courts have therefore held that Section 2462 does not bar injunctive relief as a matter of law. *See United States v. Telluride Co.,* 146 F.3d 1241, 1245 (10th Cir.1998); *United States v. Banks,* 115 F.3d 916, 919 (11th Cir.1997); *Westvaco,* 144 F.Supp.2d at 443 n. 2; *Murphy Oil,* 143 F.Supp.2d at 1087. As previous courts have held and according to the plain language of Section 2462, the statute of limitations does not operate to bar the EPA and Intervenor–Plaintiffs' claims for injunctive relief.

## CONCLUSION

For the reasons set forth in this opinion, the court will deny Duke Energy's motion for summary judgment, grant in part and deny in part the EPA's motion for partial summary judgment in which Intervenor–Plaintiffs join, deny Intervenor–Plaintiffs' motion for partial summary judgment on Duke Energy's defense of "fair notice," and deny Duke Energy's motion for partial judgment on the pleadings. Remaining for trial will be the issues of whether Duke Energy's projects were routine maintenance, repair, and replacement as defined relative to the. industrial category and whether Duke Energy's projects caused an increase in annual net emissions, assuming constant hours and conditions of operation.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### *ORDER and JUDGMENT*

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED that Duke Energy's motion for summary judgment [Doc. # 128] is **DENIED**.

IT IS FURTHER ORDERED that the United States' motion for partial summary judgment [Doc. # 132] on the applicable legal tests for "routine maintenance" and calculation of emissions, and on Duke Energy's defenses of "fair notice" and "routine maintenance," in which Intervenor–Plaintiffs join [Doc. # 130], is **DENIED**.

IT IS FURTHER ORDERED AND ADJUDGED that the United States' motion for partial summary judgment [Doc. # 132] on Duke Energy's defense that the statute of limitations bars the United States' claims arising from activities occurring prior to December 22, 1995, in which Intervenor–Plaintiffs join [Doc. # 130], is **GRANTED**.

IT IS FURTHER ORDERED that Intervenor–Plaintiffs' motion for partial summary judgment [Doc. # 130] on Duke Energy's defense of "fair notice" is **DENIED**.

---

**29.** The EPA concedes that it "will not seek civil penalties from Duke [Energy] for days of violation prior to December 22, [1995]—five years prior to the filing of this enforcement action." (EPA Opp'n Mot. Partial Judg. on Pleadings at 2 n. 1.) ·

IT IS FURTHER ORDERED that Duke Energy's motion for partial judgment on the pleadings [Doc. # 37] is **DENIED**.

Remaining for trial are the issues of whether Duke Energy's projects were routine maintenance, repair, and replacement as defined relative to the industrial category and whether Duke Energy's projects caused an increase in annual net emissions, assuming constant hours and conditions of operation.